Kim GOODMAN, Pro Se, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 09–839 L.

United States Court of Federal Claims.

Sept. 28, 2011.

Kim Goodman, Calhoun, GA, pro se.

Joshua A. Doan, Washington, DC, with whom was Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, for defendant. Cara M. Johnson, Environmental Litigation Attorney, United States Air Force, Washington, DC, of counsel.

## OPINION

BUSH, Judge.

This takings case is currently before the court on defendant's motion for judgment on the pleadings based on lack of subject matter jurisdiction, pursuant to Rules 12(b)(1) and 12(c) of the Rules of the United States Court of Federal Claims (RCFC). For the reasons set forth herein, defendant's motion for judgment on the pleadings is granted.

## BACKGROUND

In this case, plaintiff alleges that defendant took an avigation easement over her property without just compensation in violation of the Takings Clause of the Fifth Amendment. More specifically, she argues that frequent low-altitude flights by military aircraft arriving at, and departing from, Dobbins Air Reserve Base (Dobbins) have resulted in a permanent and substantial interference with the use and enjoyment of her property.

Defendant responds that the claims raised in the complaint are untimely and are therefore beyond the subject matter jurisdiction of

this court. In addition, defendant contends that certain of those claims must be dismissed because they sound in tort. For the reasons discussed below, the court holds that none of the claims raised by plaintiff are within this court's subject matter jurisdiction.

## I. Factual Background[1]

### A. Dobbins Air Reserve Base

Dobbins is a 143–acre military installation located approximately fifteen miles northwest of Atlanta in Cobb County, Georgia. Decl. of Clarence L. Miller (Miller Decl.) ¶ 6.[2] Dobbins commenced operations in 1941 as a civil aviation facility, then known as Rickenbacker Field, and was later acquired by the United States in 1943 for the assembly of B–29 aircraft at an on-site facility now known as Plant 6.[3] *Id.* ¶¶ 8, 13. While the host unit at Dobbins performed an operational mission in the past, the installation is now used primarily to train reservists in the United States Air Force (Air Force). *Id.* ¶ 14.

### 1. Physical Organization of the Installation

The primary airstrip at Dobbins has a generally east-west orientation and is designated as Runway 11/29.[4] Miller Decl. ¶ 15. The western half of the airstrip is known as Runway 11, while the eastern half is known as Runway 29. *Id.* ¶ 17. Runway 11/29, which was constructed in 1941 and expanded in 1951, has a total length of 10,000 feet and a total width of 300 feet. *Id.* ¶ 15. The centerline of the airstrip has not moved since its original construction in 1941, and the dimensions of the runway have not changed since 1951. *Id.* ¶¶ 15–16.

In addition to Runway 11/29, there is also a secondary airstrip at Dobbins, which is designated as Runway 110/290. *Id.* ¶ 18. Runway 110/290 is also known as the "assault landing strip." *Id.* The construction of the assault landing strip was completed in 2003, and the airstrip became operational in February of that year. *Id.* The assault landing strip runs parallel to Runway 11/29, and is 3500 feet long and 60 feet wide. *Id.* Runway 110/290 is adjacent to Runway 29, *see* Pl.'s Resp. Ex. F, and its west end is located approximately one and one-half miles east of the west end of Runway 11, Miller Decl. ¶ 18.

There are also two helicopter landing pads at Dobbins—the north helipad and the south helipad—which are both located at the western end of the airfield. *Id.* ¶ 19. Dobbins is also home to Plant 6 and a number of accessory buildings. *See id.* ¶ 13; Pl.'s Resp. Ex. F.

### 2. Base Tenants

In recent years, Dobbins has been home to at least one private contractor and a number of military tenants, which are described below.

#### a. 94th Airlift Wing

The host unit at Dobbins is the Air Force's 94th Airlift Wing, which has been stationed at Dobbins since the 1970s and has been operating C–130s at the installation since the 1980s.[5] Miller Decl. ¶ 9. Between 1998 and the present, there have been eight C–130s associated with the host unit at Dobbins, all of which are used to train pilots, navigators, and loadmasters. *Id.* ¶ 27.

#### b. Naval Air Station Atlanta

The United States Navy operated Naval Air Station (NAS) Atlanta at the installation from 1959 until 2008. Miller Decl. ¶ 11. Between 2001 and 2008, both the Navy and the United States Marine Corps had F/A–18s stationed at NAS Atlanta. *Id.* ¶¶ 33–34. All twelve of the F/A–18s operated by the Navy had departed Dobbins by June 2004, *id.* ¶ 33,

---

1. The facts presented in this section are drawn from the complaint, defendant's motion for judgment on the pleadings, and Ms. Goodman's response to that motion.

2. Mr. Miller serves as the Airfield Operations Manager at Dobbins, a position he assumed in September 2001. Miller Decl. ¶ 1.

3. In 1948, Dobbins was designated as Marietta Air Force Base, and was assigned the mission of

training Air Force reservists. Miller Decl. ¶ 8. In 1950, the installation was renamed Dobbins Air Force Base, and in 1992 the base's name was changed to Dobbins Air Reserve Base. *Id.*

4. Runway 11/29 has a slightly northwest-southeast orientation. *See* Pl.'s Resp. Ex. F.

5. The C–130s attached to the host unit are a version of the aircraft known as the C–130H. Miller Decl. ¶ 27.

while all twelve of the F/A–18s operated by the Marines had left the base by June 2008, *id.* ¶ 34. In addition to its F/A–18s, the Navy also had stationed at Dobbins six E–2C aircraft, one UC–12B, and between two and four C–9Bs during that time period. *Id.* ¶ 33. In 2001, the Marines had stationed at Dobbins six AH–1N and four UH–1N helicopters, which began to leave the installation in 2008. *Id.* ¶ 34. By the summer of 2010, none of those helicopters remained on the base. *Id.*

### c. Georgia Army National Guard

The Georgia Army National Guard (National Guard) is also stationed at Dobbins, and has operated eight UH–60 Blackhawk helicopters, three OH–58 observation helicopters, and one C–26 Metroliner at the installation since 2002.[6] Miller Decl. ¶ 36.

### d. Lockheed Martin

Lockheed Martin has been operating Plant 6 at Dobbins since the 1950s. *Id.* ¶ 13. During that time, Lockheed has constructed and modified various aircraft at that facility, including the C–5, the C–130J, and the F–22. *Id.* As discussed more fully below, the F–22s manufactured at Plant 6 are subjected to several test flights before leaving the installation and are accompanied by an F–16 chase plane during those flights.

### 3. Types and Frequency of Flight Operations

### a. Types of Aircraft at Dobbins

In her complaint, Ms. Goodman alleges that supersonic jets frequently pass over her property at altitudes of less than sixty feet.[7] The F–22, F–16, and F/A–18 are the only types of aircraft that have been stationed at Dobbins in the recent past that are capable of reaching supersonic speeds, and those aircraft do not, except in emergencies, travel at such speeds within the airspace controlled by the Dobbins tower. Miller Decl. ¶¶ 50–51. In fact, aircraft within that airspace are not

allowed to travel faster than 250 knots, which is well below the speed of sound. *Id.* ¶ 51.

As noted above, the host unit at Dobbins has been operating C–130s at the base since the 1980s, and there have been eight C–130s attached to that unit since 1998. *Id.* ¶¶ 9, 27. The C–130 is a cargo plane. It is not a jet and is not capable of traveling at supersonic speeds. *Id.* ¶ 9.

In 2001, the Navy and the Marines each operated a total of twelve F/A–18s at the base, for a total of twenty-four F/A–18s permanently stationed at Dobbins. *Id.* ¶¶ 33–34. Between February and August of 2005, the Marine unit to which the F/A–18s were attached was deployed to Iraq, and those twelve aircraft were not present at the base during that time. *Id.* ¶ 34. As noted above, the last of the F/A–18s operated by the Navy and the Marines left the installation permanently in June 2004 and June 2008, respectively. *Id.* ¶¶ 33–34.

In addition to their F/A–18s, the Navy and Marines also operated other types of aircraft at Dobbins. From sometime before 2001 until August 2008, the Navy operated six E–2Cs there. *Id.* ¶ 33. The Navy also operated between two and four C–9Bs and one UC–12B from sometime before 2001 until May 2009. *Id.* From sometime before 2001 until 2010, the Marines operated six AH–1N helicopters and one UH–1N helicopter at the base. *Id.* ¶ 34. None of those Navy or Marine aircraft are capable of achieving supersonic speeds. *Id.* ¶ 50.

Production of the F–22 commenced at Plant 6 in 1998 and is expected to continue through 2012. *Id.* ¶ 38. Each new F–22 is required to complete five "checkout" flights from Runway 11/29 before it is transferred to a permanent duty station. *Id.* The F–22 checkout flights are performed with an F–16 chase plane and are conducted between 9:00

---

6. The Georgia Air National Guard was once stationed at Dobbins as well, but it no longer has a presence there. Miller Decl. ¶ 10.

7. In her complaint, Ms. Goodman asserts that supersonic jets pass over her property at an altitude of 59.9 feet. Compl. ¶ 5. In her response, plaintiff asserts that the easement acquired by the government in 2008 permits over-

flights at an altitude of forty-four feet. *See* Pl.'s Resp. at 5. Plaintiff does not explain the basis for either of those figures, but the court surmises that the latter figure was derived by calculating the altitude at which the 34:1 obstacle clearance surface intersects with the boundaries of Ms. Goodman's property.

a.m. and 5:00 p.m. *Id.* Based on the total production of F–22s between 1998 and 2012, there have been an average of sixty-five F–22 checkout flights each year. The F–22s and the associated F–16s are the only planes still present at Dobbins that are capable of reaching supersonic speeds, and, as noted above, those aircraft are not permitted to travel at such speeds within Dobbins-controlled airspace. *Id.* ¶¶ 50–51.

Lockheed Martin also performs repairs and maintenance at Plant 6 on transient C–5s and C–130s. *Id.* ¶ 37. Lockheed typically services one to two C–5s each month, while repairs on C–130s are intermittent. *Id.* Because Lockheed does not perform repairs or maintenance on F–22s at Plant 6, the only F–22s present at Dobbins are those in production. *Id.* ¶ 38.

In addition to the F–16 chase planes that follow the F–22s during test flights, four F–16s were temporarily assigned to Dobbins following the events of September 11, 2001. Miller Decl. ¶ 43. Those F–16s departed the base in October 2002. *Id.*

The Georgia Army National Guard currently maintains eleven helicopters (eight UH–60s and three OH–58s) and one plane (a C–26) at Dobbins. *Id.* ¶ 36. None of them are capable of achieving supersonic speeds. *Id.* ¶ 50.

In addition to the aircraft permanently stationed at Dobbins, a number of transient aircraft use Runway 11/29 and pass through the installation's airspace. *Id.* ¶ 40. Some of the transient aircraft on the base are small planes that use the base to refuel, while other flights included in the operations counts for the installation pass through its airspace without landing or using the runways. *Id.* ¶¶ 40–41. Since 2001, the type and volume of transient aircraft using Runway 11/29 have not changed. *Id.* ¶ 40.

Between August and November of 2005, as discussed in more detail below, a small number of additional aircraft were temporarily stationed at Dobbins in connection with re-

sponse efforts for Hurricanes Katrina and Rita. *See id.* ¶ 44.

### b. Takeoff, Landing, and Training Exercises

For at least twelve years, flights landing on Runway 11 under instrument flight rules have been required to travel along a three-degree slope to a point 750 feet down the runway from the west end of the airstrip. Decl. of Stacy A. Free (Free Decl.) ¶ 6.[8] While the flight paths of planes taking off from Runway 29 have likewise remained unchanged over the last decade, those departing flights follow a steeper slope than that used by planes arriving at the base.[9] When an aircraft takes off from Runway 29, its pilot is required under regulation and standard departure procedures to execute the maximum rate of climb in order to reduce aircraft noise over the Fair Oaks neighborhood, in which Ms. Goodman's property is located. *Id.* ¶¶ 13–14, 16.

In her declaration, Ms. Free presents calculations of the lowest possible altitudes at which planes taking off from Runway 29 or arriving on Runway 11 could pass through the airspace over Ms. Goodman's property. *Id.* ¶ 13. When traveling along the three-degree slope required at Dobbins, planes landing on Runway 11 would pass through the airspace above Ms. Goodman's property at an elevation of approximately 355 feet. *Id.* When a plane departs from Runway 29 along lowest permitted slope for takeoff, the departing plane would pass through the airspace over Ms. Goodman's property at an elevation of approximately 117 feet. *Id.* For the reasons discussed below, the assumptions upon which Ms. Free's calculations were based lead to estimated elevations that are substantially lower than the altitudes at which planes actually pass over the property.

The actual elevation of planes passing over Ms. Goodman's property following takeoff from Runway 29 would almost always be higher than 117 feet. First, that estimated elevation assumes that a plane does not be-

---

**8.** Ms. Free has served as the Air Traffic Control Terminal Instrument Procedures (TERPS) Specialist at Dobbins since July 2001. From September 1998 until July 2001, she was a primary Air Traffic Controller at Dobbins. Free Decl. ¶ 1.

**9.** When an aircraft departs from Runway 29, it begins on the east end of Runway 11/29 and travels west.

come airborne and begin its ascent until it reaches the end of the runway. *Id.* ¶ 16. Most planes departing Dobbins, however, require between 5000 and 7000 feet of departure roll prior to takeoff and therefore become airborne long before reaching the end of the 10,000–foot runway. *Id.* Second, as noted above, all planes departing Runway 29 are required by regulation to execute the maximum rate of climb following takeoff in order to mitigate noise impacts on the Fair Oaks neighborhood and thus do not travel along the three-degree slope required for arriving aircraft. *Id.* ¶¶ 14, 16. Indeed, Ms. Free states that most flights departing from Dobbins would pass over the Fair Oaks neighborhood at an elevation of more than 500 feet. *Id.* ¶ 16.

The estimated elevations for both arriving and departing flights as they pass over Ms. Goodman's property are based on the lowest slope permitted for aircraft under precision instrument flight rules at Dobbins. *Id.* ¶¶ 6, 14. As noted in the declaration of Ms. Free, pilots almost always maintain a margin of safety between their own elevation and the lowest permitted glide slope. *Id.* ¶ 15.

None of the tenants at Dobbins have conducted field landing practice with any frequency since 2001, even before the closing of NAS Atlanta.[10] Miller Decl. ¶ 35. However, C–130 crews do conduct occasional touch-and-go landings, also called "touch-and-goes," on Runway 11/29, and the F/A–18s operated by the Navy and Marines performed such exercises prior to their final departure from

Dobbins. *Id.* ¶¶ 31, 33–34. In addition, test aircraft manufactured at Plant 6 and transient aircraft sometimes conduct touch-and-go landings as well. *Id.* ¶¶ 39, 42. The frequency of such landings at Dobbins did not increase for any type of aircraft subsequent to December 7, 2003, and those exercises are never conducted on the assault landing strip.[11] *Id.* ¶¶ 31, 33–34, 39, 42.

The assault landing strip performs a far more limited function at Dobbins than Runway 11/29. As noted in the declaration of Mr. Miller, the assault landing strip is used exclusively by C–130s for landing practice, is not generally used for takeoff by any aircraft, and is never used for touch-and-go exercises. *Id.* ¶¶ 30–31. Most C–130 practice approaches at Dobbins use the assault landing strip, which runs parallel to Runway 11/29. *Id.* ¶ 18. When C–130s land on the assault landing strip, they generally taxi to the main runway before takeoff. *Id.* Before 2002, when the assault landing strip was constructed, C–130 crews at Dobbins conducted practice landings on a simulated assault landing strip painted on the surface of Runway 11/29. *Id.* ¶ 28. Perhaps because plaintiff did not mention the assault landing strip in her complaint, and because her claim was based on low-altitude flights by supersonic jets, rather than on overflights by C–130s during their approach to the assault landing strip, the government did not attempt to estimate the altitude at which C–130s landing on the assault landing strip

10. Field landing practice is a training exercise designed to simulate landing on an aircraft carrier. The United States Court of Appeals for the Federal Circuit and its predecessor, the United States Court of Claims, have both held that, in some circumstances, the impacts of field landing practice can be so "peculiarly burdensome" that aircraft conducting such exercises can effect a taking of an avigation easement even when those planes do not pass directly over the property, *see Argent v. United States,* 124 F.3d 1277, 1284 (Fed.Cir.1997), or even when those planes do not pass over the property below the minimum safe altitude of flight prescribed by the Federal Aviation Administration (FAA), *see Branning v. United States,* 654 F.2d 88, 90 (Ct.Cl.1981). In most circumstances, of course, overflights will not effect a taking unless they involve a direct invasion of the airspace over the subjacent property at an elevation below the minimum safe altitude of

flight. *See id.* at 99 ("Under the 'great weight' of Federal authority, noise alone, without an actual physical invasion of the superjacent airspace, is merely consequential damage within the rule of *Richards v. Washington Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914), and thus not compensable under the fifth amendment.").

11. Ms. Goodman states that her "understanding of the explanation of the 'Assault Strip' is that it acts as a Runway for Touch and Go's[,]" and, alternatively, that the assault landing strip is not used for landing or takeoff at all, but is "used to simulate landing and take-off as if the aircraft was landing or taking off however the aircraft in the simulation does not actually land or take off." Pl.'s Resp. at 6, 13. As explained in this opinion, both of those statements are incorrect.

would pass over Ms. Goodman's property.[12]

The flight paths for the helicopters stationed at Dobbins have remained unchanged since at least 2001. *Id.* ¶ 19. Departing helicopters usually head straight north after a vertical takeoff from one of the two helipads, and arriving helicopters usually approach those helipads from the north. *Id.* Approximately ninety-five percent of departures from and approaches to the helipads are to and from the north, so the helicopters do not generally travel over the Fair Oaks neighborhood during either departure or arrival. *Id.*

### c. Frequency of Operations

With the exception of Christmas and New Year's Day, when the installation is closed, and absent extraordinary circumstances, Dobbins operates seven days a week from 7:00 a.m. until 11:00 p.m. Miller Decl. ¶ 7. Two or three times each summer, C–130 crews conduct exercises using night-vision goggles for approximately one hour beyond the base's normal operating hours. *Id.* ¶ 32.

The government has presented two sources of data on annual air traffic at Dobbins. The first is data drawn from the Air Traffic Annual Reporting System (ATARS) prepared by the Air Force Flight Standards Agency. *See id.* Tab 1. The second is the annual count of flight operations maintained by the Dobbins tower. *See id.* Tab 2. Both of those systems track the number of flight operations during each fiscal year (FY).

Both ATARS and the local counts maintained at Dobbins keep track of all flight operations, which include runway activity as well as overflights through airspace controlled by the Dobbins tower, even when the aircraft passing through the airspace never actually use the runways on the base. *Id.* ¶ 47. When a single aircraft arrives at, and then departs from, Dobbins, that activity is counted as two separate operations. *Id.* Overflights account for approximately sixteen

to twenty percent of total operations in the annual traffic count. *Id.* ¶ 48. The annual operations totals for FY2001 through FY2009 are presented below.

| Fiscal Year | ATARS | Local Count |
|---|---|---|
| 2001 | 94,542 | 93,430 |
| 2002 | 25,214 | 84,506 |
| 2003 | 114,285 | 92,090 |
| 2004 | 105,536 | 90,139 |
| 2005 | 100,392 | 79,265 |
| 2006 | 103,246 | 90,028 |
| 2007 | 89,576 | 67,852 |
| 2008 | 98,713 | 84,368 |
| 2009 | 98,669 | 89,435 |

Miller Decl. ¶¶ 45–46.

Since 2001, according to ATARS, the highest level of air traffic at Dobbins occurred in FY2003. Similarly, in terms of total annual operations, the Dobbins local counts identify FY2001 and FY2003 as the busiest fiscal years since 2001. While both ATARS and the local counts demonstrate a small upward trend in annual traffic since FY2007, neither FY2008 nor FY2009 experienced as much air traffic as FY2003.

With only two exceptions, the operating hours at the base have remained unchanged for many years. Following the terrorist attacks on September 11, 2001, Dobbins became a so-called "scramble" location for Atlanta Hartsfield Airport, and four F–16s were temporarily stationed at the installation to respond to questionable radar targets. *Id.* ¶ 43. Those F–16s were available for such missions around the clock, but they were the only aircraft authorized to operate outside of the base's normal operating hours. *Id.* Furthermore, the F–16s were allowed to operate outside of normal operating hours only during an active scramble mission. *Id.* During

---

12. The court notes that the western terminus of Runway 11/29 is approximately one and one-half miles west of the west end of the assault landing strip. Miller Decl. ¶ 18. Assuming that the C–130s are required to approach the assault landing strip along the same three-degree slope required for planes approaching Runway 11/29 under instrument flight rules, those C–130s would pass over the Fair Oaks neighborhood at a much higher altitude than flights landing on Runway 11/29, although the route of those higher-altitude flights might be closer to the property because the centerline of the assault landing strip is situated south of the centerline of Runway 11/29.

their first three months at Dobbins, the F-16s completed an average of one active scramble mission each week, and such missions were rare following that initial three-month period. *Id.* The additional F-16s departed Dobbins in October 2002. *Id.*

In August 2005, the operating hours at Dobbins were temporarily increased in order to accommodate support missions following Hurricanes Katrina and Rita. From August 30, 2005 until September 30, 2005, the installation operated around the clock to support medical and personnel evacuations. *Id.* ¶ 44. During the first ten days of that period, passenger aircraft arrived at the base every hour. *Id.* Subsequent to that initial ten-day period, the arrival of evacuation flights became less frequent. *Id.*

Keesler Air Force Base in Biloxi, Mississippi was severely damaged by Hurricane Katrina. *Id.* As a result, the Air Force's 403rd Wing was temporarily relocated to Dobbins from August 31, 2005 until November 2, 2005. *Id.* During that short period, the 403rd Wing, which performs airlifts and weather reconnaissance missions, operated additional WC–130Js and C–130Js at Dobbins. *Id.*

## B. Ms. Goodman's Property and Easements

Ms. Goodman owns a small parcel of land and related improvements located at 1321 Joyner Avenue in Marietta, Georgia (also known as Tract 750–E), within the Fair Oaks neighborhood. Compl. ¶ 1; Miller Decl. ¶ 20; Def.'s Mot. Ex. D, Tab 6. Her property is improved with a single-family residence and is located to the west of Runway 11. Pl.'s Resp. at 6. The parcel is located approximately 500 feet south of the projected centerline of Runway 11/29 and is located partially within the approach zone for Runway 11. Miller Decl. ¶ 21. While Ms. Goodman once lived on the property, she moved to a new

residence in November 2005. Pl.'s Resp. at 24.

## 1. The 1963 Easement

Since 1963, Ms. Goodman's property has been encumbered by a perpetual avigation easement held by the United States (the 1963 easement). *See* Def.'s Mot. Ex. E. Defendant acquired that easement through an express grant from one of Ms. Goodman's predecessors-in-interest.[13]

Under the 1963 easement, the United States holds

> a perpetual easement and right-of-way for the free and unobstructed flight of aircraft of any kind or character, in, through, and across the air space above the glide angle plane in the runway approach zone area, hereinafter described, over [the property], which lies within said zone, hereinafter more particularly described as the western end of the East–West Runway of Dobbins Air Force Base.

*Id.* at 1.

The 1963 easement describes the glide angle plane as

> a trapezoidal plane above the runway approach zone beginning at the end of the clear zone at the elevation of the end of the runway and rising over the runway approach zone on a slope of 50 feet horizontally to 1 foot vertically for a horizontal distance of 10,000 feet.

*Id.* at 2. The glide angle plane described in the 1963 easement is also known as an obstacle clearance surface.[14]

Under the 1963 easement, the runway approach zone is a horizontal plane located at ground level that begins 1000 feet from the west end of Runway 11/29 and extends 10,000 feet along the projected centerline of the runway. *Id.* The runway approach zone is trapezoidal in shape and has a width of 1500 feet at its east end and 4000 feet at its west

---

**13.** Defendant notes that the government acquired the 1963 easement as part of a settlement agreement with a plaintiff in *Allgood v. United States,* No. 122–59 (Ct.Cl.1963) (Stipulation of Dismissal). Def.'s Mot. at 3 n. 3.

**14.** An obstacle clearance surface is an imaginary trapezoidal plane that is designed to protect de-

parting and arriving aircraft from natural and man-made obstructions located in close proximity to the airfield. Free Decl. ¶ 7. The FAA requires both civilian and military airfields to prevent the penetration of any physical obstruction into the obstacle clearance surface. *Id.*

end. *Id.* The centerline of the runway approach zone is the projected centerline of Runway 11/29. *Id.* Ms. Goodman's property is located partially within the runway approach zone.

The 1963 easement further notes, however, that

> the easement and right-of-way for the free and unobstructed passage of aircraft hereby granted and conveyed shall be limited to a minimum height of 225 feet in, through, and across the air space above grantor's property, measured vertically from the highest point on said property.

*Id.*

Finally, the 1963 easement states that "[n]othing herein shall be construed as entitling the United States of America to raze or remove the presently existing structures and trees upon said property." *Id.* at 3.

In short, the 1963 easement contains two central features. First, it establishes an obstacle clearance surface with a 50:1 slope, which must permit the "unobstructed passage" of aircraft from Dobbins.[15] While the easement implicitly prohibits penetrations into the obstacle clearance surface, it does not authorize the government to remove such obstacles. Second, the 1963 easement establishes an avigation easement that allows aircraft to pass through airspace over the obstacle clearance surface, subject to a minimum altitude requirement of 225 feet.

#### 2. The 2008 Easement

Before 2002, the required obstacle clearance surface projecting from the two ends of Runway 11/29 had a shallow 50:1 slope.[16] Free Decl. ¶ 9. Because that slope was so restrictive, Dobbins was granted several waivers to allow physical objects to penetrate that surface. *Id.* The 1963 easement imposed an obstacle clearance surface with a 50:1 slope in accordance with that requirement. *See* Def.'s Mot. Ex. E at 2. Because Dobbins was permitted to obtain waivers for penetrations into the surface, however, the

1963 easement did not authorize the United States to remove such obstructions.

In 2002, in a document entitled Change 19 to the Terminal Instrument Procedure (TERPS) Manual, the Federal Aviation Administration (FAA) changed the slope of the required obstacle clearance surface for Runway 11/29 at Dobbins from 50:1 to 34:1. Free Decl. ¶ 10. Due to that steeper slope, however, Dobbins was no longer allowed to obtain waivers from the requirement that it protect the obstacle clearance surface. *Id.* Since 2002, Dobbins has been required to secure the permanent removal of any off-site obstacles penetrating into the 34:1 surface.

In September 2004, the government prepared an environmental assessment for the acquisition of the clearance and avigation easements necessary to protect the new 34:1 obstacle clearance surface. *See* Pl.'s Resp. Ex. H. In the assessment, the government considered three alternatives: (1) acquiring easements over all properties located within the 34:1 glide slope; (2) acquiring easements only for those properties in which physical obstructions already penetrated into the obstacle clearance surface; or (3) taking no action at all. *See id.* at 2. Based on its environmental assessment, the government selected the first option. *Id.* at 3.

On June 30, 2005, the government sent a letter to Ms. Goodman, in which it expressed its intention to acquire an avigation easement over her property. *See* Pl.'s Resp. Ex. G. The letter included a form entitled "Offer to Sell Easement," to be completed by plaintiff, and informed her that the government had estimated the value of the easement to be $200. *Id.* at 1.

On November 14, 2008, the government commenced a direct condemnation action in the United States District Court for the Northern District of Georgia for the purpose of acquiring a new easement over Ms. Goodman's property. *See* Def.'s Mot. Ex. A. In the declaration of taking filed in the direct

---

**15.** The glide slope indicates the horizontal distance traveled by an aircraft for each foot of vertical altitude or descent. For example, an aircraft traveling along a 50:1 glide slope would travel fifty feet of horizontal distance for every foot of vertical ascent or descent.

**16.** Prior to 2002, the 50:1 obstacle clearance surface had been in place since the beginning of airfield management to protect precision instrument approaches. Free Decl. ¶ 9.

condemnation action, defendant estimated the value of the easement to be $200, and it deposited that sum with the district court as required under 40 U.S.C. § 3114 (2006). Def.'s Mot. Ex. A at 4. Title to the easement (the 2008 easement) vested in the United States on that date.[17]

Under the 2008 easement, the United States enjoys

[a] perpetual and assignable easement for the operation of aircraft to and from the Dobbins Air Reserve Base in, on, over and across Tract 750–E, consisting of the right to make low and frequent flights over and above the 34:1 Glide Slope and to generate noises associated with: aircraft in flight, whether or not while directly within the 34:1 Glide Slope, aircraft and aircraft engines operating on the ground at said base, and aircraft engine test-stand operations at said base. . . .

Id. at 7. In other words, the 2008 easement authorizes the passage of government aircraft through the airspace over Ms. Goodman's property above the new 34:1 obstacle clearance surface. While the 34:1 surface would pass over the property at a higher elevation than the previous 50:1 surface, the 2008 easement does not contain the 225–foot limitation set forth in the 1963 easement. The 2008 easement also allows the government to subject the property to noise from aircraft and aircraft engines, regardless of whether the source of that noise is located above the obstacle clearance surface.

In addition to the avigation easement contained in the 2008 easement, that document also contains a much more comprehensive clearance easement than the one embodied in the 1963 easement. While the 1963 easement on Ms. Goodman's property prevented the penetration of the 50:1 obstacle clearance surface by any new obstructions, it further provided that "[n]othing herein shall be construed as entitling the United States to raze or remove the presently existing structures and trees upon said property." Def.'s Mot. Ex. E at 3.

In contrast, the 2008 easement authorizes the government to enter the property and cut or remove any physical obstructions within ten feet of the obstacle clearance surface. Def.'s Mot. Ex. A at 7. The 2008 easement also allows the government to regulate or prohibit a wide variety of activities on the property that might interfere with flights over the property. Id. The activities subject to regulation or abatement under the 2008 easement include those that result in the emission of smoke, steam, dust, light, or electricity. Id. The easement also authorizes the government to post signs on the property to indicate the nature and scope of the easement on the property. Id.

## C. The Alleged Taking

In her complaint, Ms. Goodman alleges that "[c]ommencing on or about August 5, 2005, and continuing through November 14, 2008, there has been a heavy and steady succession of flights of supersonic air force jet aircraft over [her] property at altitudes as low as 59.9 feet during take-offs and landings from [Dobbins]." Compl. ¶ 5. These frequent, low-altitude flights of supersonic jet aircraft have, according to Ms. Goodman, resulted in a permanent and substantial interference with the use and enjoyment of her property and have therefore resulted in the taking of an avigation easement over her property through inverse condemnation. Id.

## II. Procedural History

Plaintiff commenced suit in this court on December 7, 2009, alleging that frequent, low-altitude flights by supersonic jets departing from and arriving at Dobbins effected a physical taking of an avigation easement over her land without just compensation in violation of the Takings Clause of the Fifth Amendment.[18] Plaintiff has requested just

---

17. As of the date of this opinion, the direct condemnation action is still pending in district court. When the United States acquires property through eminent domain, however, title to the acquired property vests in the government on the date that the government files a declaration of taking and deposits with the court the sum of money estimated as just compensation in the declaration. See 40 U.S.C. § 3114(b). The government satisfied those requirements on November 14, 2008. See Def.'s Mot. Ex. A at 4.

18. Ms. Goodman filed her complaint through counsel, but her attorney filed a motion to withdraw from this case on May 6, 2010. The court

compensation for the property allegedly taken, plus reasonable attorneys' fees and costs, including those authorized under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (2006). Defendant filed its answer to the complaint on March 8, 2010.

On November 5, 2010, defendant filed a motion for judgment on the pleadings, pursuant to RCFC 12(c), based on lack of subject matter jurisdiction. In that motion, defendant advances two arguments. First, defendant asserts that Ms. Goodman's takings claim would have accrued—if at all—more than six years before she filed her complaint in this court. For that reason, defendant argues that her claim is barred under the six-year statute of limitations set forth in 28 U.S.C. § 2501 (2006). Second, defendant argues that any claims based on the alleged discharge of smoke or fumes onto Ms. Goodman's property sound in tort and are therefore beyond this court's subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006). In any event, defendant argues that the claims set forth in Ms. Goodman's complaint must be dismissed for lack of subject matter jurisdiction.

Ms. Goodman filed her response to defendant's motion on April 5, 2011. While her complaint appears to focus largely on a temporary taking of an avigation easement from August 2005 until November 2008, Ms. Goodman's response mainly argues that she is entitled to more money than the government has estimated as just compensation for the 2008 easement in the direct condemnation action pending in district court. Ms. Goodman also asserts that her claims are timely and do not sound in tort. Finally, Ms. Goodman's response raises a number of miscellaneous issues that will be discussed more fully below.

Defendant replied to Ms. Goodman's response on May 2, 2011. In its reply, the government argues that plaintiff has failed to meet her burden of establishing subject matter jurisdiction and contends that many of the new issues raised in her response are similarly beyond the jurisdiction of this court.

granted that motion, and Ms. Goodman is now

## DISCUSSION

### I. Standards of Review

#### A. *Pro Se* Litigants

*Pro se* plaintiffs are entitled to a liberal construction of their pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (requiring that allegations contained in a pro se complaint be held to "less stringent standards than formal pleadings drafted by lawyers"). However, " '[t]here is no duty on the part of the trial court to create a claim which [the plaintiff] has not spelled out in his pleading.' " *Scogin v. United States*, 33 Fed.Cl. 285, 293 (1995) (quoting *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir.1975) (internal punctuation omitted)). Here, the court has thoroughly examined the complaint and the response to defendant's motion for judgment on the pleadings, and has attempted to discern all of the legal arguments contained therein.

#### B. Standard of Review under RCFC 12(c)

The court's rules provide that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." RCFC 12(c). When the moving party has challenged the court's subject matter jurisdiction over the suit, the court must resolve the motion in accordance with the same standards applicable to a motion to dismiss under RCFC 12(b)(1). *See Renewal Body Works, Inc. v. United States*, 64 Fed.Cl. 609, 612 (2005) (" '[I]f a party raises an issue as to the court's subject matter jurisdiction on a motion for judgment on the pleadings, the ... judge will treat the motion as if it had been brought under Rule 12(b)(1).' " (quoting 5C Charles Alan Wright & Arthur Miller, *Federal Practice & Civil Procedure* § 1367, at 221 (3d ed. 2004))).

#### C. Standard of Review under RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdic-

proceeding *pro se* in this matter.

tion pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Patton v. United States*, 64 Fed.Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). Although "pro se plaintiffs are held to a lower standard of pleading than those represented by counsel, all those seeking to invoke this court's subject matter jurisdiction ultimately retain the burden of establishing that the jurisdictional requirements are met." *See Searles v. United States*, 88 Fed.Cl. 801, 803 (2009) (citing *Keener v. United States*, 551 F.3d 1358, 1361 (Fed.Cir.2009)); *Minehan v. United States*, 75 Fed.Cl. 249, 253 (2007) ("[T]he leniency afforded to a *pro se* litigant with respect to mere formalities does not relieve the burden to meet jurisdictional requirements.").

The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461–62 (Fed.Cir.1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir. 1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed.Cir.2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

## II. Jurisdiction and Legal Standards for Overflight Takings

The Fifth Amendment of the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Pursuant to the Tucker Act, this court has exclusive subject matter jurisdiction over takings claims against the United States seeking more than $10,000 in compensation. *See* 28 U.S.C. § 1491(a)(1); *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309–10 (Fed.Cir. 2008).

This court has explained that suits under the Takings Clause generally fall into one of three broad categories:

> Over the years, the law has distinguished three broad categories of takings: those defined by the governments' powers of eminent domain, those resulting from a "physical invasion" by the government without bringing an eminent domain proceeding, and those resulting from the impact of regulation. The first two, having an older lineage, could be referred to as "traditional takings," and the latter two require a landowner to file an "inverse condemnation" suit seeking just compensation.

*Res. Inv., Inc. v. United States*, 85 Fed.Cl. 447, 470–71 (2009) (footnotes and citations omitted); *see also Agins v. City of Tiburon*, 447 U.S. 255, 258 n. 2, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) ("Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.' ") (citing *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)) (internal citation omitted). Under the Tucker Act, this court has subject matter jurisdiction over inverse condemnation claims against the United States. It does not, however, have jurisdiction over direct condemnation actions initiated by the government.

In *United States v. Causby*, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the Supreme Court held that flights through airspace over private land may constitute a taking when "they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *See also A.J. Hodges Indus., Inc. v. United States*, 355 F.2d 592, 594 (Ct.Cl.1966) ("The courts have held that when regular and frequent flights by Government-owned aircraft over privately owned land at altitudes of less than 500 feet from the surface of the ground constitute a direct, immediate, and substantial interference with the use and enjoyment of the property, there is a taking by the Government of an avigation easement, or easement of flight, in the airspace over the property, and that this taking is compensable under the Fifth Amendment to the Constitution.").

Suits based on the inverse condemnation of an avigation easement due to overflights of government aircraft fall into the second category of takings actions described above: a physical invasion without formal condemnation proceedings. In most types of physical invasion cases, the permanent invasion or occupation of private property effects a compensable taking irrespective of whether that incursion results in any damage to the property or in any diminution in its value. *See Hendler v. United States*, 952 F.2d 1364, 1375 (Fed.Cir.1991) ("A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action achieves an important public purpose or has only minimal economic impact on the owner.") (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458

U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)).

When an inverse condemnation claim is based upon the physical invasion of airspace over a landowner's property, however, the mere invasion of that airspace does not always constitute a taking. First, subject to certain narrow exceptions not applicable here, flights by government-owned aircraft at elevations exceeding the minimum safe altitudes of flight established by the FAA are generally immunized from suits under the Takings Clause.[19] *See Aaron v. United States*, 311 F.2d 798, 801 (Ct.Cl.1963) ("Hence, flights above 500 feet over noncongested areas are in the navigable air space in which there is 'a public right of freedom of transit.' The public has a right to travel in this air space with the same freedom and the same immunity as it has to travel the public highways or navigable waters. Any incidental injury done to adjacent property that is 'unavoidably attendant' upon use of any highway, whether on land, or water, or in the air, is non-compensable.").

Second, claimants who allege the taking of an avigation easement through inverse condemnation must demonstrate that the overflights have resulted in a direct, immediate, and substantial interference with the use and enjoyment of the burdened property. *See Causby*, 328 U.S. at 266, 66 S.Ct. 1062 ("Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."); *Mock v. United States*, 164 Ct.Cl. 473, 475 (1964) ("The gravamen of an action for the taking of an easement of flight is the unreasonable interference with the use and enjoyment of the land."); *Hero Lands Co. v. United States*, 554 F.Supp. 1262, 1263 (Cl.Ct.1983)

19. The Supreme Court has explained the rationale for precluding takings claims based on high-altitude overflights:

It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum*. But that doctrine has no place in the modern world. The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recog-

nize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim. *Causby*, 328 U.S. at 260–61, 66 S.Ct. 1062 (footnote omitted); *see also Branning*, 654 F.2d at 97 ("The Supreme Court long ago put to rest the ancient common law doctrine that ownership of the land extends to the periphery of the universe.").

("This court's predecessor, the U.S. Court of Claims, whose decisions are binding on this court, established the rule that, so long as flights by government-owned aircraft through the airspace above land do not interfere substantially with the use and enjoyment of the property, the Government is not liable to the landowner for the taking of an avigation easement, even though the flights are at impermissibly low altitudes.") (citations omitted).

In *Brown v. United States*, 73 F.3d 1100 (Fed.Cir.1996), the Federal Circuit described the necessary elements of an overflight takings claim:

> In the *Causby* case, the Court considered three factors significant in determining whether noise and other effects from overflights interfered with the property owner's rights in such a way as to constitute a taking of an avigation easement and hence require compensation: (i) the planes flew directly over the claimant's land, (ii) the flights were low and frequent, and (iii) the flights directly and immediately interfered with the claimant's enjoyment and use of the land. Our caselaw following *Causby* has added a gloss on the third factor, requiring that the interference with enjoyment and use be "substantial."

*Id.* at 1102 (citations omitted). In order to prevail on her takings claim, Ms. Goodman must meet each of the elements described above.

### III. Overview of Ms. Goodman's Claims

In this case, plaintiff alleges that frequent low-altitude overflights by military aircraft have taken an avigation easement over her property through inverse condemnation, and that she is therefore entitled to just compensation for the value of that easement. There is a significant divergence between the claims raised in the complaint and those expressed or implied in the response to defendant's motion for judgment on the pleadings.

In the complaint, Ms. Goodman asserts that the government acquired an avigation easement over her property without instituting formal condemnation proceedings or paying her just compensation. Plaintiff alleges that defendant took the easement through inverse condemnation on or about August 5, 2005, and that the taking continued until November 14, 2008, when defendant commenced a direct condemnation action for the purpose of formally acquiring the easement. Plaintiff thus argues that the government effected a temporary taking of an avigation easement over her property when supersonic jets passed through the airspace over her property at altitudes of less than sixty feet. That temporary taking, according to plaintiff, commenced in August 2005 and ended when the government acquired the easement through eminent domain in November 2008.[20]

Ms. Goodman raises a number of new claims and arguments in her response to the government's motion for judgment on the pleadings. First, she argues that she is entitled to compensation in this court for the government's acquisition of the 2008 easement. Second, Ms. Goodman appears to shift from the initial claim in her complaint—that supersonic jets pass over her property at unreasonably low altitudes—to a wholly new claim: that the construction of the assault landing strip has increased the number of flights over her property. As noted above, C–130s are the only aircraft that utilize the assault landing strip at Dobbins, so flights by those aircraft—rather than supersonic jets—must form the basis of any takings claim

---

**20.** While the complaint alleges a temporary taking of an avigation easement, it also appears to suggest that the taking may have been permanent. *See* Compl. ¶ 6 (requesting compensation for the taking of an easement "from the date of the taking up through and including at least November 14, 2008, *if not until the present day* ") (emphasis added). In her response, moreover, plaintiff argues not only that the easement is permanent, but that she is entitled to the full value of her home as compensation. *See* Pl.'s Resp. at 4, 24. In other words, Ms. Goodman appears to argue that the alleged taking of an avigation easement has rendered her property valueless. *See Mid–States Fats & Oils Corp. v. United States*, 159 Ct.Cl. 301, 310 (1962) ("The measure of just compensation for the taking of an easement by the Government over privately owned land is the difference between the fair market value of the land just before the easement was taken and the fair market value of the land just after the easement was taken.") (citation omitted).

based on the construction of the assault landing strip.

In her response to the government's motion for judgment on the pleadings, Ms. Goodman describes the terms of the avigation easement acquired by the government in the direct condemnation action now pending in district court, argues that the activities authorized under the easement are a violation of her property rights, and requests that the court award damages in excess of what the government has estimated as the fair market value of the acquired easement. Those issues, however, must be raised by plaintiff in the direct condemnation action now pending in district court.

■ There is no dispute that the actions contemplated under the 2008 easement, such as the intrusion of military aircraft into the lower reaches of the airspace above Ms. Goodman's property, the production of substantial noise during those flights, and the right to enter the property and remove or prevent obstructions into the obstacle clearance surface described in the easement, would require the government to acquire an easement to perform those activities, either through a voluntary transaction with Ms. Goodman or through the exercise of its eminent domain authority. Here, the government has now embarked upon the latter course, and commenced a direct condemnation action in district court on November 14, 2008. Because the government commenced a formal condemnation proceeding to acquire the 2008 easement, plaintiff cannot now allege a taking of the exact same easement through inverse condemnation. *See Robertson v. United States*, 352 F.2d 539, 544 (Ct. Cl.1965) ("Although the taking of the clearance easements reduced the value of plaintiffs' property, plaintiffs have been compensated for such damage in the condemnation proceedings.").

■ When the United States seeks to acquire property through the exercise of its eminent domain authority, it initiates a direct condemnation action in district court for that purpose. This court, in contrast, does not possess subject matter jurisdiction over such proceedings. First, Congress has vested exclusive jurisdiction over such actions in the district courts. 28 U.S.C. § 1358 (2006) ("The district courts shall have original jurisdiction of all proceedings to condemn real estate for the use of the United States or its departments or agencies."); 28 U.S.C. § 1403 (2006) ("Proceedings to condemn real estate for the use of the United States or its departments or agencies shall be brought in the district court of the district where the land is located or, if located in different districts in the same State, in any of such districts."). In addition, in a direct condemnation action, the United States is the plaintiff and the landowner (or the property) is the defendant. Because this court's jurisdiction is limited to "suits against the United States," a direct condemnation action would not fall within the jurisdictional grant of the Tucker Act.

■ Furthermore, this court is not the proper forum in which to challenge the amount of compensation to which Ms. Goodman is entitled for the 2008 easement. Indeed, the entire purpose of the direct condemnation proceedings now pending in district court is to determine whether the avigation easement has been taken for an authorized "public use," and the quantum of compensation to which plaintiff is entitled under the Fifth Amendment. Nor will this court have jurisdiction to review the amount of compensation ultimately awarded by the district court in the pending direct condemnation action. *See Joshua v. United States*, 17 F.3d 378, 380 (Fed.Cir.1994) (noting that "the Court of Federal Claims does not have jurisdiction to review the decisions of district courts ... relating to proceedings before those courts").

There is no dispute that the government acquired an avigation easement over Ms. Goodman's property in 2008, nor is there any dispute that defendant acquired that property interest in a direct condemnation action in district court. While Ms. Goodman may be dissatisfied with the quantum of compensation proposed by defendant in district court, that issue must be raised and contested in that forum. Accordingly, the only potential claims that might be raised in this court are: (1) that defendant's actual use of the airspace over Ms. Goodman's property has exceeded

the scope of the easement taken in 2008; and (2) that defendant actually took the easement not in November 2008, but in August 2005. Ms. Goodman does not allege that defendant's flights through the airspace over her property have exceeded the scope of the 2008 easement; instead, she argues that the terms of the 2008 easement are an infringement of her property rights. Thus, the only claim properly before this court is that the government implemented the terms of that easement through inverse condemnation before commencing condemnation proceedings in district court. *See Georgia–Pacific Corp. v. United States,* 568 F.2d 1316 (Ct.Cl.1978) (suspending proceedings in an inverse condemnation suit because only the district court possessed the authority to determine the total amount of compensation due for the taking of the same property interest in a direct condemnation action).

While the government did not commence direct condemnation proceedings until November 14, 2008, plaintiff asserts that the government acquired an avigation easement through inverse condemnation more than three years earlier. In order to demonstrate that the government acquired an easement through inverse condemnation in August 2005, Ms. Goodman must demonstrate that the government conducted frequent flights at low altitudes over her property at that time, and that those flights substantially interfered with the use and enjoyment of her property. *See Powell v. United States,* 1 Cl.Ct. 669, 674 (1983) ("The elements involved in the taking of an avigation easement by the Government consist of flights by government-owned aircraft through the airspace above a tract of land (1) which are regular and frequent, (2) which are at impermissibly low altitudes, and (3) which interfere substantially with the use and enjoyment of the land.").

For the limited purpose of resolving its motion for judgment on the pleadings, the government concedes that is has taken an avigation easement over the subject property, but further argues that the alleged taking

occurred more than six years before plaintiff filed her suit in this court. Accordingly, the sole issue now before the court is whether the alleged taking occurred before or after December 7, 2003. For the reasons set forth below, the court concludes that the complaint in this case was filed more than six years after the accrual of the takings claims raised by plaintiff, and that those claims are therefore untimely.

## IV. Timeliness of Ms. Goodman's Claims

A suit for just compensation under the Fifth Amendment must be filed in this court within six years of the date on which the takings claim first accrues. 28 U.S.C. § 2501. The United States Supreme Court has held that the six-year statute of limitations is an absolute jurisdictional limitation that cannot be waived by the government. *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (holding that the court's statute of limitations is jurisdictional in nature and is thus not subject to waiver or estoppel). Plaintiff filed the instant suit on December 7, 2009. In order to be considered within the limitations period set forth in section 2501, Ms. Goodman's claims must have accrued no earlier than December 7, 2003.[21] If her claims accrued before that date, then this court is without jurisdiction to hear them.

### A. Claim Accrual and Statute of Limitations in Overflight Takings Cases

A claim against the government under the Tucker Act first accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir. 1988) (emphasis in original). In determining whether Ms. Goodman knew, or should have known, of the requisite factual predicates establishing the government's alleged liabili-

---

**21.** In her response, Ms. Goodman states that "the date of December 7, 2003 has no significance concerning this case other than it is 6 years from December 7, 2009 which is the date Plaintiff filed this Case." Pl.'s Resp. at 7. That date, of course, is critically important in that any claims set forth in the complaint must have accrued no earlier than that date in order to meet the six-year statute of limitations set forth in section 2501.

ty in this case, the court must apply an objective standard. *See Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir.1995) (holding that "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue"). Because Ms. Goodman bears the burden of establishing subject matter jurisdiction, she must demonstrate by a preponderance of the evidence that she could not have reasonably known of the facts fixing defendant's alleged liability prior to December 7, 2003.

■ In general, a "claim for the taking of an avigation easement by the Government accrues, and the 6-year limitation period begins to run, when regular and frequent intrusions by Government aircraft into the airspace above land at low altitudes begin to interfere seriously with the use and enjoyment of the land." *Town & Country Motor Hotel, Inc. v. United States,* 180 Ct.Cl. 563, 565 (1967) (citation omitted); *see also Lacey v. United States,* 595 F.2d 614, 618 (Ct.Cl. 1979) ("The taking of an avigation easement by the Government occurs when the Government begins to operate aircraft regularly and frequently over a parcel of land at low altitudes, with the intention of continuing such flights indefinitely.").

■ Here, the government does not dispute that its overflights have taken an avigation easement over Ms. Goodman's property, but argues that the taking occurred more than six years before she filed suit in this court. That concession alone, however, does not necessarily deprive this court of jurisdiction over Ms. Goodman's claims. The taking of an avigation easement at some point in the distant past does not preclude the taking of a new avigation easement due to the imposition of a substantial new burden on the affected property:

Under [such a] theory, if the Government is granted an easement permitting an officer or agent of the Government to walk over a person's land, and later the Government marches an army over said land thereby causing damage far greater, no cause of action could be maintained because the action accrued when the walking easement was granted. It seems clear

that such accrual would be manifestly unjust and unfair and consequently could not be the law.

*Davis v. United States,* 295 F.2d 931, 933 n. 1 (Ct.Cl.1961). Rather, in light of the government's concession, Ms. Goodman must be afforded an opportunity to demonstrate that the initial taking of an avigation easement, or a second more substantial taking of such an easement, occurred within the limitations period.

In order to prevail on her claim, Ms. Goodman must demonstrate that the initial taking—or a second, increased incremental taking—occurred after December 7, 2003. To meet her burden on that issue, Ms. Goodman must prove that the impacts to her property have substantially increased during the limitations period due to a change in the elevation or flight paths of existing aircraft, a substantial increase in the number of flights over her property, or the introduction of new planes at Dobbins. *See Town & Country,* 180 Ct.Cl. at 567–72 (examining the total number of planes stationed at the base, the number of flights to and from the base, and the flight patterns of those planes in determining whether there was any substantial change in those factors within the limitations period). In support of its motion for judgment on the pleadings, the government may present evidence to demonstrate that there has been no change in those factors during the limitations period. *See Brin v. United States,* 159 Ct.Cl. 332, 340 (1962) (dismissing a claim alleging the taking of an avigation easement because "[t]here was no substantial difference between the type of interference with the use and enjoyment of these lands that was occurring in the summer of 1954 and the type that later occurred during the 6-year period that preceded [the date on which the complaint was filed], since it appears that the jet aircraft which flew over the lands during the latter period did not fly at lower altitudes or make more noise ... than the jet aircraft which were flying over the lands in the summer of 1954"); *Powell,* 1 Cl.Ct. at 672 (dismissing a claim alleging the taking of an avigation easement because the government submitted an affidavit that established that the number of flights per year

peaked before the start of the limitations period and had fallen since that time, and that there had been no change in the mix of aircraft stationed at the base or in the altitudes at which those aircraft passed over the plaintiffs' properties).

First, a change in the elevations or flight paths of existing aircraft may impose such a substantial burden on the affected property so as to take a second easement. In *Herring v. United States*, 162 F.Supp. 769 (Ct.Cl. 1958), for example, the plaintiffs purchased a parcel of land within the approach zone to a runway on a military installation and improved that property with a house and parking areas for trailers. When the plaintiffs purchased the property, the base had been used for years to train pilots on single-engine, propeller-driven planes, but a number of tall trees between the runway and the property required those planes to reach an elevation of at least seventy-five feet before entering the airspace over the property. With the owners' permission, the government removed between forty and fifty of the tallest trees on the property, which allowed planes to pass over the property only fifteen feet above the house and between seven and nine feet above an antenna on the roof of the house. These lower flights resulted in a substantial increase in noise on the property. The court concluded that any claims based on the alleged taking of an avigation easement for overflights above seventy-five feet were untimely under section 2501, but further held that the lower flights made possible by the removal of the tall trees on the property resulted in a second incremental taking for which the plaintiffs were entitled to compensation. *See also Town & Country*, 180 Ct.Cl. at 570 (dismissing a claim alleging the taking of an avigation easement because, *inter alia*, "[t]he traffic pattern followed by jet aircraft taking off from this runway toward the northwest, and the traffic pattern followed by jet aircraft approaching this runway from the northwest preparatory to landing in a southeasterly direction, have been substantially the same from 1957 until the present time").

■ Second, a substantial increase in the number of overflights over a property can result in a second incremental taking of an avigation easement, regardless of whether that increase is the result of an increase in the total number of operations at the base or a change in the flight patterns or routes of aircraft at the base. In *Klein v. United States*, 152 Ct.Cl. 221 (1961), the plaintiffs purchased a parcel of land in 1939 and built a house on the property. Two years later, the government commenced construction of Andrews Air Force Base in close proximity to the property. Beginning in 1943, propeller-driven planes from the base began passing over the plaintiffs' property. Beginning in 1947, a number of P–80 jet aircraft were stationed at the base and began passing over the plaintiffs' property. Finally, in 1954, the base commander instituted a new flight pattern for the P–80s that dramatically increased the number of flights over the property. In its initial decision, *Klein v. United States*, 152 Ct.Cl. 208 (1960), the court held that the plaintiffs' suit was barred by the six-year statute of limitations set forth in section 2501 because their takings claim first accrued when the P–80s started passing over their property. On reconsideration, however, the court held that the extent of the government's use of the plaintiffs' airspace was neither known nor ascertainable prior to 1954, when the base adopted a new flight pattern for the P–80s, and the total number of overflights increased substantially. *See also Boardman v. United States*, 376 F.2d 895, 897 (Ct.Cl.1967) (dismissing a claim alleging the taking of an avigation easement because "[t]he volume and varieties of flights and aircraft prior to December 1957 (the date six years prior to suit) were not substantially different from those thereafter from the standpoint of increasing the interference with use of plaintiffs' land"); *Town & Country*, 180 Ct.Cl. at 569 (dismissing a takings suit as time-barred because, *inter alia*, there was no increase in the number of planes assigned to the military base at issue, nor was there any increase in the number of flight operations at that base, during the six-year period preceding the filing of the complaint).

■ Finally, the introduction of new planes on a military base may result in the taking of a second avigation easement, even

when there is no change in the total number of overflights. In *Davis*, 295 F.2d at 931, for example, the plaintiffs' property had been subjected to frequent overflights by B–36 jets from a nearby military installation for several years. The plaintiffs conceded that those flights substantially interfered with the use and enjoyment of their property, and also conceded that any takings claim based on those flights was thus barred under the six-year statute of limitations. The plaintiffs further argued, however, that the introduction of B–52s and KC–135s on the base, and their frequent low-altitude flights over the property, resulted in a second taking. The Court of Claims agreed, holding that overflights by the larger and substantially louder B–52s and KC–135s rendered the plaintiffs' property uninhabitable. *See also Branning v. United States*, 654 F.2d 88, 101 (Ct.Cl. 1981) (holding that the introduction of new aircraft and their use for field mirror landing practice resulted in the taking of a second avigation easement); *Avery v. United States*, 330 F.2d 640, 642 (Ct.Cl.1964) (holding that "the introduction of larger, heavier, noisier aircraft can constitute a fifth amendment taking of an additional easement even though the new aircraft do not violate the boundaries of the initial easement"); *Persyn v. United States*, 32 Fed.Cl. 579, 583 (1995) ("Even where the government has acquired an avigation easement a new taking can occur if the government increases its intrusion by flying substantially noisier planes within existing easements, or by flying at lower altitudes."); *Powell*, 1 Cl.Ct. at 673 ("It is well established by the cases, for example, that although the Government, at an earlier time, has taken an avigation easement in the airspace above a tract of land, a 'second taking' may occur if the Government later begins to overfly the land with noisier aircraft.") (citations omitted).

In addition to demonstrating a change in the flight paths of existing aircraft, a substantial increase in the number of overflights, or the introduction of new aircraft, a plaintiff must prove that there has been an increased interference with the use and enjoyment of the property and that the new activities have resulted in an additional diminution in the value of the property:

[W]here the nature and degree of the disturbance to private property rights in approach zones below the line of flight is substantially worsened and rendered intolerable by the use of aircraft which, because of their size, power, noise, altitude and flight characteristics, or because of structural changes in the airport layout, impose a greater degree of interference in the enjoyment of property over which they pass en route to or from their operating runways than the conditions which previously inhered, a significant depreciation in the market value of the property as a direct result of the overflights is not only prerequisite to recovery of just compensation but also marks the date of taking from which applicable statutes of limitation commence to run and valuations for damage purposes are to be measured.

*Boardman*, 376 F.2d at 899; *see also Robertson*, 352 F.2d at 543 (dismissing a claim alleging a taking of an avigation easement because the "[p]laintiffs have not shown by a preponderance of the evidence that the interference with the use and enjoyment of their property was increased to any significant extent" when new planes were introduced on the base); *Hero Lands*, 554 F.Supp. at 1267 (dismissing a takings claim because "[t]he plaintiffs did not prove that the military jet aircraft. . . . used in operations at [the base] during the 6–year limitations period adversely affected the potential of [their] lands for subdivision development to a substantially greater degree than did the military jet aircraft . . . used in operations at [the base] before the beginning of the 6–year limitations period").

**B. Ms. Goodman's Claims Are Barred under the Six–Year Statute of Limitations Applicable to Takings Claims in this Court**

Ms. Goodman has failed to establish that the initial taking of an avigation easement—or a second, increased incremental taking of an avigation easement—occurred subsequent to December 7, 2003. First, Ms. Goodman has not demonstrated that there has been any change in the elevation or flight paths of planes arriving at or departing from

Dobbins. Second, Ms. Goodman has not established that the number of flights passing over her property has increased since that date. Finally, Ms. Goodman has not demonstrated that any new types of aircraft have been introduced at Dobbins since December 2003, or that the noise level on her property attributable to Dobbins aircraft has increased in that time. For those reasons, the court concludes that Ms. Goodman's takings claims are barred by the six-year statute of limitations set forth in section 2501.

## 1. There Has Been No Change in the Flight Paths of Aircraft Arriving at or Departing from Dobbins since December 2003

Nothing in the record here supports a conclusion that the elevation or routes of flights passing through the airspace over Ms. Goodman's property have changed since December 7, 2003. The dimensions of Runway 11/29 have not changed since 1951, Miller Decl. ¶ 15, and flights arriving at and departing from that runway have traveled along or above the same required three-degree slope since at least 1998, Free Decl. ¶ 6.

Ms. Goodman notes that the government acquired an avigation easement over her land in 1963, more than thirty years before she purchased the property. While she concedes that her property was burdened by that pre-existing easement, plaintiff further asserts that the easement was limited to flights by cargo planes traveling at a minimum altitude of 225 feet along a 50:1 glide slope. In her complaint, plaintiff alleges that the more recent avigation easement acquired by the government in 2008 (or in 2005, according to plaintiff) exceeded the scope of the earlier easement and permitted supersonic jet aircraft to pass over her property at altitudes as low as 59.9 feet along a 34:1 glide slope.

It is important to note that the change in the obstacle clearance surface from a slope of 50:1 to a slope of 34:1 was not an operational change and did not affect the elevation or flight paths of aircraft arriving at, or departing from, Dobbins.[22] Change 19 to the TERPS Manual, which implemented the

change in the slope of the obstacle clearance surface, does not contemplate any change in either the altitude or flight paths of Dobbins aircraft. Instead, the change in the obstacle clearance surface simply required the government to obtain clearance easements to ensure that the surface remained clear of obstructions. The Court of Claims has explained the difference between a clearance easement and an avigation easement:

> Plaintiffs point to these clearance easements and argue that the Government's action in obtaining them indicated its intention to lower the flight angle and thus to fly its planes over plaintiffs' property at lower altitudes. Plaintiffs' conclusion does not necessarily follow, there being a distinction between the altitudes delineated by the clearance easement and the flight angle normally used. The clearance easement (sometimes called the glide angle) is not the angle at which planes normally approach the runway, but is the lowest possible angle at which aircraft can fly in approaching the runway; it is the minimum angle of approach consistent with any degree of safety. The difference between the minimum glide angle described in the clearance easement and the normal glide slope can be attributed to a safety margin designed to provide for emergencies.

*Robertson,* 352 F.2d at 543–44 (citations omitted).

In *Adams v. United States,* 680 F.2d 746, 749 (Ct.Cl.1982), the Court of Claims once again addressed the difference between a clearance easement and an avigation easement, and noted that "[t]he two types of easements are analytically separate, and just as the taking of one does not preclude the separate taking of the other, the taking of one need not include the taking of the other." Here, the 2002 change in the obstacle clearance surface from a 50:1 slope to a 34:1 slope was not an operational change and, in the absence of actual flights by government aircraft at that elevation, cannot be viewed as the taking of an avigation easement. When the government acquired the 2008 easement in the direct condemnation action, it took

---

**22.** The court also notes that a 34:1 slope is steeper than a 50:1 slope and would therefore enter

the airspace over Ms. Goodman's property at a higher altitude than the 50:1 slope.

both an avigation easement and a clearance easement. However, plaintiff has not demonstrated that the government exercised the terms of the 2008 easement prior to November 14, 2008.

In her response, Ms. Goodman advances a new argument that was not contained in her complaint: that the construction of the assault landing strip increased the number of planes that pass through the airspace over her property. This argument fails for a number of reasons. First, Ms. Goodman has not demonstrated that the use of the assault landing strip has increased the number or reduced the elevation of flights over her property, while Mr. Miller stated in his affidavit that the construction of the assault landing strip "had no effect on the elevation that the C–130's transited Fair Oaks." Miller Decl. ¶ 29. Ms. Goodman has presented no evidence that tends to disprove or contradict that statement.

Even if the court were to assume, as Ms. Goodman appears to allege, that the construction of that airstrip did result in an increased burden on her property, any takings claim based on that increased burden would be untimely. The assault landing strip was built between 2002 and 2003, and it became operational in February 2003. Miller Decl. ¶ 18. Because the impact of those flights would have occurred more than six years before plaintiff filed her complaint, any takings claim based on that impact would be untimely under section 2501.

Ms. Goodman further argues that her claim based on the construction of the assault landing strip would not have accrued before December 7, 2003, because she did not become aware of that construction until 2010. Instead, according to Ms. Goodman, her claim accrued either in June 2005, when the government sent her a letter indicating its intent to acquire an avigation easement on her property, or in September 2004, when the government published its environmental assessment for the acquisition of the clearance and avigation easements required by the new 34:1 obstacle clearance surface.

The September 2004 assessment and the June 2005 letter express the government's intention to acquire avigation and clearance easements through either voluntary purchase or eminent domain, but those documents cannot themselves give rise to a compensable taking of those easements. The documents do not purport to take anything from plaintiff. Indeed, the June 2005 letter contemplated a voluntary purchase of the required easement from plaintiff, while the environmental assessment determined that clearance easements would have to be acquired from the owners of the subjacent land at some point in the future.

■ In addition, the construction of a runway, without more, cannot effect a taking of an avigation easement over nearby property. The construction of a new runway, or the extension of an existing runway, may result in the taking of an avigation easement by increasing the number or intensity of flights over a nearby property. *See, e.g., Jensen v. United States*, 305 F.2d 444, 446–48 (Ct.Cl. 1962) (holding that the extension of two existing runways on a military base, which allowed B–47s and B–52s to pass over nearby properties at a low altitude, effected the taking of an avigation easement). Ms. Goodman asserts that the construction of the assault landing strip dramatically increased the number of flights through the airspace over her property. Even if that assertion were true, however, the increased number of overflights should have been apparent to plaintiff regardless of whether she was aware of the construction of the assault landing strip.

In *Boardman,* the Court of Claims rejected the same argument presented by Ms. Goodman here:

It may be true as the plaintiffs have averred that they were unaware of the extent and nature of the overflights until 1960, or that they did not know in 1955 that the runway channeling planes over their property had been extended so as to aggravate the problem, but the flight facts were readily apparent to anyone who took the trouble to see or to inquire, and the plaintiffs' professed ignorance of them was their own fault, as was their failure to learn prior to purchasing the property the readily ascertainable facts concerning expansion of the air station's program.

376 F.2d at 898. Here, it is irrelevant whether Ms. Goodman became aware of the assault landing strip prior to 2010, because any additional activity generated by the airstrip, and any new burdens on the property attributable to that activity, should have been apparent to her before December 7, 2003.

### 2. The Number of Flights Arriving at and Departing from Dobbins Has Not Increased since December 2003

When there is a substantial increase in the number of flights over private property near a military airfield, the noise generated by those flights may effect a taking of an avigation easement over that property, even when there has been no change in the types of planes operating at the base or in the routes or altitudes of existing aircraft. However, it is not the increased number of incursions into the superjacent airspace that substantially interferes with the use and enjoyment of the property; rather, it is the attendant noise that accompanies that increase. *See Argent v. United States*, 124 F.3d 1277, 1282 (Fed.Cir.1997) ("With the increased prominence of jet airplanes, noise and vibrations have replaced physical encumbrance as the primary complaint of claimants seeking compensation."); *Branning*, 654 F.2d at 99 ("In virtually all of the cases in which recovery has been awarded for the overflight of aircraft, the value of the land was diminished, not by the mere presence of the aircraft in the superjacent airspace, but by the attendant noise."). For that reason, a mere increase in the number of planes that pass over a parcel of land is not sufficient to establish the taking of an avigation easement without some evidence that the increased number of overflights interferes with the use and enjoyment of the property to a substantially greater degree than earlier overflights. As discussed in section IV.B.3, *infra*, there is no evidence that the noise level on Ms. Goodman's property has increased since at least 1998. For the sake of completeness, however, the court will address Ms. Goodman's allegation that the number of flights through the airspace over her property has increased since December 2003.

Ms. Goodman asserts that the number and frequency of low-altitude flights over her property increased dramatically in August 2005, approximately two months before the start of FY2006, but she presents no evidence to support her assertion in that regard. Instead, plaintiff states that the average number of planes using the Dobbins runways each day was 275 in FY2005 and 282 in FY2006, and that such numbers are more than sufficient to effect a compensable taking of an avigation easement over her property. Pl.'s Resp. at 8. Ms. Goodman's argument is flawed in a number of respects.

First, defendant has acknowledged that it has taken a perpetual avigation easement over Ms. Goodman's property. For that reason, the court need not determine whether the number of overflights at any particular point in time is sufficient to effect a compensable taking. Instead, the relevant question here is whether there has been a substantial increase in the number of overflights since December 2003. Ms. Goodman has presented no evidence relevant to that issue.

Second, the numbers proffered by plaintiff in her response indicate that, between FY2005 and FY2006, there was an increase of less than three percent in the average number of flight operations per day. Between FY2001 and FY2009, the number of flight operations at Dobbins has fluctuated from year to year, and the small change between FY2005 and FY2006 was well within that normal range. As noted above, the ATARS data indicate an increase of less than three percent between FY2005 and FY2006, following a gradual decline in the number of flight operations between FY2003 and FY2005. Miller Decl. ¶ 45. The local counts, on the other hand, demonstrate a larger increase of nearly fourteen percent during that period, but also indicate a modest decrease in the number of operations between FY2003 and FY2004 and a larger decrease of more than twelve percent between FY2004 and FY2005. *Id.* ¶ 46. In order to demonstrate that an increase in the number of overflights has resulted in the taking of an avigation easement, plaintiffs have typically been required to show a much more substantial increase in the number of overflights during the limitations period.

The ATARS data further indicate that the number of operations in FY2006 was lower than the number of operations in either FY2003 or FY2004. *Id.* ¶ 45. The local counts similarly indicate that the number of operations in FY2006 was lower than the number of operations in FY2001, FY2003, and FY2004. *Id.* ¶ 46. In short, the annual air traffic at Dobbins since December 2003 has not exceeded the number of such operations in fiscal years prior to that date. If the total number of flight operations in FY2005 or FY2006 was, as plaintiff contends, more than sufficient to result in the taking of a perpetual avigation easement, then the higher number of flight operations in earlier fiscal years must, *a fortiori*, rise to the level of a compensable taking as well. Plaintiff may not reasonably allege that the government took a particular property interest in FY2005 or FY2006 if that same property interest had already been taken at some earlier date.

More fundamentally, the number of flight operations at Dobbins is not indicative of the number of flights through the airspace over Ms. Goodman's property. The annual operations data for Dobbins indicate the total number of flight operations at the installation in a particular fiscal year and include runway activity as well as flights through Dobbins airspace. As Mr. Miller notes in his declaration, overflights through Dobbins airspace (*i.e.*, planes that pass through that airspace without using the base's runways) represent between sixteen and twenty percent of the recorded flight operations in the annual counts. Because overflight activities have limited noise impacts on the ground, those flights also have limited probative value in determining whether the government has taken an avigation easement over the property. *See* Miller Decl. ¶ 48 ("Overflights transit our airspace at high altitudes and generally do not have much of an impact on the noise generated at Dobbins.").

Furthermore, even after the data on flight operations are adjusted to account for such overflight activity, the resulting figures are not an accurate or particularly useful measurement of the impact on Ms. Goodman's property because not all flights that use the Dobbins runways pass over her property at low altitudes. In fact, many of the recorded flights depart towards, or arrive from, the east and would not pass over the Fair Oaks neighborhood at all. *Id.* ¶ 17 ("Because the prevailing winds in the area come from the west, about 35% to 40% of air traffic at Dobbins ARB take off and land using Runway 11, which is the west end of the airstrip, while 60% to 65% use Runway 29, the east end of the airstrip.").

Within the small remaining number of flight operations that either arrive at Dobbins from the west or leave the base and travel west, the only flights that would actually pass over Ms. Goodman's property would be those that deviate significantly from the projected centerline of the runway.[23] It should be apparent that a simple count of the total number of flight operations at Dobbins is an insufficient basis for an inverse condemnation claim. *See Persyn*, 32 Fed.Cl. at 585 ("[T]he question of whether there was a taking by overflight ... cannot be resolved merely by comparing numbers. [Rather, the court must also consider] the noise generated by the aircraft models, the frequency of flight for different models, the altitudes of flight, the hours of flight, the effect on the use and enjoyment of plaintiffs' land, and the damages, if any, attributable to [the] overflights....").

The evidence does not support Ms. Goodman's allegation that the number of flights through the airspace over her property experienced a permanent and substantial increase on August 5, 2005. While there was a temporary increase in air traffic beginning on August 30, 2005 due to response efforts for Hurricanes Katrina and Rita, the volume and

---

23. Ms. Goodman appears to assume that pilots at Dobbins routinely ignore the regulations that require them to execute the maximum rate of climb over the Fair Oaks neighborhood, frequently deviate from the projected centerline of the runway, and blithely place their own lives in jeopardy by traveling along the obstacle clearance surface without a safety margin. In his declaration, Mr. Miller acknowledged that it is possible that pilots occasionally deviate from the projected centerline of the runway. Miller Decl. ¶ 22. Such isolated events, caused by the inadvertence of individual pilots, would amount to a trespass rather than a taking and would not be within the subject matter jurisdiction of this court.

frequency of flights at Dobbins returned to normal levels within two months.[24] As discussed in section V below, that short-term increase in activity cannot provide the basis for a takings claim in this court.

### 3. No New Aircraft Have Been Introduced at Dobbins since December 2003

Every type of aircraft that has been stationed at Dobbins since 2001 was also stationed at Dobbins before 2001. Miller Decl. ¶ 24. Since 1998, eight C–130s have been permanently assigned to the 94th Airlift Wing at Dobbins. *Id.* ¶ 27. Similarly, the National Guard operated the same number and type of helicopters and the same type of plane before and after December 2003. *Id.* ¶ 36. Lockheed Martin has manufactured and tested F–22s and used F–16s as chase planes during test flights since 1998. *Id.* ¶ 38. With the gradual closure of NAS Atlanta between 2004 and 2010, the number of aircraft at the installation has actually been reduced significantly. *See id.* ¶¶ 33–34, 49.

Ms. Goodman argues that the noise associated with Dobbins aircraft has increased substantially since August 2005. As discussed above, there was no permanent increase in the number of flight operations at Dobbins subsequent to December 2003, nor has there been any change in the types of aircraft operating at the base since that time, with the exception of the permanent departure of the aircraft attached to NAS Atlanta. Notwithstanding that uncontroverted evidence, plaintiff nonetheless maintains that the noise level on her property has increased during the relevant time period. The available evidence does not support that assertion.

The Air Force established the Air Installation Compatible Use Zones (AICUZ) program in 1972. Decl. of Lynn Engelman (Engelman Decl.) ¶ 3a. Under that program, the Air Force prepares reports to assist state and local governments with planning compatible development in areas surrounding air installations. *Id.* The Air Force prepared AICUZ reports for Dobbins in 1977, 1980, 1984, 1992, and 1998. *Id.* ¶¶ 2, 9.

As a part of the AICUZ report for each installation, the Air Force uses a program known as NOISEMAP to create a noise contour map for the surrounding area. *Id.* ¶ 5. The noise contour map indicates the average sound level exposure for areas near the base, measured in decibels (dB or dBA), over a twenty-four-hour period, as augmented by a ten decibel penalty for operations that occur between the hours of 10:00 p.m. and 7:00 a.m. *Id.* ¶ 6. The unit of measurement applied by NOISEMAP is known as DNL, which is mathematically denoted as Ldn. *Id.* The noise contour map for Dobbins captures all noise generated by all tenants at the base, not just the noise attributable to the aircraft operated by the Air Force. *Id.* ¶ 10. The noise contour maps indicate the average noise levels in the areas surrounding the base through the use of contour lines marked at five-decibel intervals. *See id.* Tabs 1–5.

In 1977, Ms. Goodman's property was located within the DNL 65 dB contour. *Id.* ¶ 11. In 1980 and 1984, her property was located within the DNL 75 dB contour. *Id.* Finally, in 1998, her property was located within the DNL 70 dB contour. *Id.* In other words, according to the AICUZ reports, the average noise level on Ms. Goodman's property increased between 1977 and 1980, remained unchanged between 1980 and 1984, and decreased between 1984 and 1998.[25] The Air Force has not prepared an AICUZ report for Dobbins since 1998.

In 2008, counsel for plaintiff hired a consultant to study and prepare a report on the noise levels on Ms. Goodman's property attributable to Dobbins aircraft.[26] *See* Def.'s Mot. Ex. G. The consultant monitored noise

---

**24.** The base operated on a twenty-four-hour schedule for only one month, but the Air Force's 403rd Wing remained at the base until November 2, 2005. Miller Decl. ¶ 44.

**25.** The Declaration of Lynn Engelman does not indicate the noise level on Ms. Goodman's property in 1992, even though an AICUZ study was prepared that year.

**26.** The noise study commissioned by plaintiff was measured at a property adjacent to, but closer to Dobbins than, Ms. Goodman's property. *See* Def.'s Mot. Ex. G at 1 (noting that noise was measured at 1270 Fair Oaks Avenue), Ex. D Tab 6 (showing location of properties).

levels on the property on July 24, 2008, and noted that "thirty-eight (38) C–130J cargo planes flyovers were measured at the site," but "not all [of those] cargo planes fly directly over the site." *Id.* at 1. During its twenty-four-hour survey, "no fighter jets were observed to be taking off or landing at Dobbins AFB." *Id.* Because no fighter jets were observed during its initial survey, the consultant returned to the site to monitor aircraft noise "during the Dobbins AFB air show" for the purpose of "captur'[ing] noise from F–15's, F–18's, F–22's, and the USAF Thunderbirds."[27] *Id.*

The report concluded that "[t]he 24–hour noise survey indicates that the Ldn exceeds 65 dBA...." *Id.* at 3. Furthermore, the report notes that "[d]epending on the number of fighter jets utilizing the Dobbins AFB runways and the direction of take off, it is estimated that the Ldn may be in the 70 dBA—75 dBA range on certain days." *Id.* However, the report cautions that such a prediction must be "verified in the future on a day the fighter jets are flying." *Id.*

In short, the consultant commissioned by plaintiff measured the noise level on the property on a typical day, and the results of his measurements indicated that the current noise level is approximately the same as it was in 1977. He returned to the property to measure the noise level during the annual air show and determined that the noise level "on certain days" might reach the same noise level measured on the property between 1980 and 1984. The report does not provide substantial support for Ms. Goodman's allegation that overall noise levels on the property have increased significantly in recent years.

In fact, Ms. Goodman appears to believe that the noise associated with Dobbins aircraft had become incompatible with the use of her property for residential purposes by the time the 1998 AICUZ report was prepared. *See* Pl.'s Resp. at 6 ("Even the out-

dated 1998 AICUZ Citizens Brochure of a mere 6 pages shows on page 4 that in Clear Zones and Accident Potential Zones that the decibel level is incompatible with residential single family homes.").[28] Plaintiff has failed to carry her burden of demonstrating that there was any substantial increase in the noise attributable to Dobbins aircraft subsequent to December 2003.

## V. Temporary Taking During Hurricane Response Efforts

■ In her complaint and response, Ms. Goodman alleges that the government effected a temporary taking of an avigation easement due to overflights by supersonic jets or by C–130s from the assault landing strip. Those overflights, according to plaintiff, commenced in August 2005 and ended in November 2008. Ms. Goodman has not argued that the temporary increase in activities at Dobbins due to hurricane response efforts between August 30, 2005 and November 2, 2005 effected a temporary taking during that two-month period. The court notes, however, that such a brief interference with the use and enjoyment of Ms. Goodman's property does not rise to the level of a compensable taking.

■ In *Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1355 (Fed.Cir.2003), the Federal Circuit held that a takings claimant "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances." In determining whether an invasion of private property is properly analyzed under takings law, a court must first examine whether the government intended to invade a protected property interest or whether the alleged invasion of a claimant's property was the direct, natural, or probable result of defendant's intentional actions. *Id.* at 1355–56. Next, the court must determine whether the government ap-

---

**27.** The court notes that there are no F–15s stationed at Dobbins, nor have those aircraft been represented there in the recent past. Furthermore, the last of the F/A–18s departed the base in 2008.

**28.** The clear zone at the end of the runway indicates the high potential for accidents in that area, not the level of noise there. *See* Engelman

Decl. ¶ 4. However, the 1998 AICUZ brochure referenced by Ms. Goodman does indicate that the level of noise on her property, as estimated in all of the AICUZ reports between 1977 and 1998, was incompatible with residential development unless "sound attenuation materials" were used. *See* Pl.'s Resp. Ex. E at 4.

propriated a benefit for itself at the property owner's expense or preempted the owner's right to enjoy their property for an extended period of time. *Id.* at 1357–58.

In order to meet the second prong of the test, Ms. Goodman must prove that defendant's interference with her property "was substantial and frequent enough to rise to the level of a taking." *Id.* at 1357; *see also Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.2005) (holding that a takings claimant "must show that the invasion appropriated a benefit to the government at the expense of the property owner, at least by preempting the property owner's right to enjoy its property for an extended period of time, rather than merely by inflicting an injury that reduces the property's value"); *Wilfong v. United States,* 480 F.2d 1326, 1329 (Ct.Cl.1973) (holding that in order "to support a Fifth Amendment taking via inverse condemnation there must be not only a Federal activity or project which is permanent in nature, but that such activity or project must impose on private property certain consequences which are themselves permanent, and that their recurrence is inevitable even if only intermittent"). Ms. Goodman must satisfy both prongs of the *Ridge Line* test to demonstrate that her claims are properly analyzed under takings law.

Neither this court, the Federal Circuit, nor the Court of Claims has held that a two-month increase in the number or intensity of flight operations at a military installation is sufficient to effect a taking of an avigation easement over nearby land. In takings cases involving a physical invasion due to government-induced flooding, this court has recognized that such an invasion must be either permanent or inevitably recurring to constitute a taking under the Fifth Amendment. *See, e.g., Nat'l By–Products, Inc. v. United States,* 405 F.2d 1256, 1274 (Ct.Cl.1969) (rejecting a takings claim because the plaintiff had not demonstrated that the flooding of its property would inevitably recur); *N. Counties Hydro–Electric Co. v. United States,* 70 F.Supp. 900, 903 (Ct.Cl.1947) ("It is clear under the authorities that the flooding of an owner's land on but one occasion does not constitute a taking. Before there can be a

taking a servitude must have been imposed upon the land, that is to say, a subjection of the land for a more or less definite time to a use inconsistent with the rights of the owner."). Furthermore, the Court of Claims has held that "the permanence factor establishing a Fifth Amendment taking is equally applicable to aerial invasions of private property by Federal action." *Wilfong,* 480 F.2d at 1329.

In *Speir v. United States,* 485 F.2d 643 (Ct.Cl.1973), the Court of Claims held that the government effected a temporary taking of an avigation easement. There, helicopters passed over the subject property at low altitudes in order to reach a temporary site established by the government for landing practice during the Vietnam War. The property was subjected to those overflights for almost five years, and, during most of that time, the helicopters passed over the property at a rate of approximately 10,000 per month. The court in *Speir* rejected the plaintiffs' argument that the flights effected a permanent taking of an avigation easement. Because the government never intended to continue the flights, or the operation of the landing site, beyond the end of the military conflict, the court held that those flights had effected only a temporary taking of an avigation easement.

Here, in contrast, the increased activity at Dobbins attributable to response efforts for Hurricanes Katrina and Rita lasted for no more than two months, and Ms. Goodman has presented no evidence—nor even alleged—that her property suffered any substantial diminution in value as a result of the increased number of medical and personnel evacuation flights arriving at and departing from Dobbins during that short period of time. Rather, she argues in her complaint that frequent flights of supersonic jets at low altitudes have effected a taking of an avigation easement over her property, and she argues in her response that flights to and from the assault landing strip—which could only be C–130s—have resulted in a taking. Unlike the five-year period at issue in *Speir,* the two-month increase in activities at Dobbins is not sufficiently permanent to merit treatment under takings law.

**CONCLUSION**

Because the court holds that Ms. Goodman's claims are untimely and thus barred under 28 U.S.C. § 2501, the court need not address the argument that certain of the claims raised in the complaint are beyond the jurisdiction of this court for the additional reason that they sound in tort. For those reasons, it is hereby **ORDERED** that

(1) Defendant's Motion for Judgment on the Pleadings Based on Lack of Subject Matter Jurisdiction, filed November 5, 2010, is **GRANTED;**

(2) The Clerk's Office is directed to **ENTER** judgment for defendant, and to **DISMISS** the complaint, without prejudice; and

(3) No costs.